GRIFFIN, J.
Western Diversified Services, Inc. (“WDS”) appeals a final judgment entered in favor of Bob Dance Dodge, Inc. (“Bob Dance”) in an action for breach of contract.
On June 24, 1992, Bob Dance[1] entered into an agreement with WDS whereby Bob Dance was to offer extended service contracts to its customers. The contract had two parts — a “Dealer Agreement” and an “Amendment to Dealer Agreement for Trust Participation” [“Trust Amendment”].
Under the “dealer agreement,” each Bob Dance dealership was to solicit and issue WDS extended service contracts to its customers. It also was obligated to make covered repairs, for which it was to be reimbursed by WDS. WDS also agreed to review, adjust and settle claims for covered repairs. Concerning termination, the original contract provided:
VII. Duration of AGREEMENT.
This AGREEMENT shall be effective on date first written above and shall continue in force until terminated by either party giving to the other not *1174 less than thirty (30) days written notice of such termination. However, this AGREEMENT only covers CONTRACTS with effective dates after the issuance of the insurance policy described in Article II Section B above. Termination of this AGREEMENT shall not affect the responsibilities of either party on CONTRACTS issued prior to the effective date of termination.
This AGREEMENT shall be automatically terminated by DEALER if no CONTRACTS are submitted hereunder for a period of sixty days or if a petition in bankruptcy is filed by or against DEALER.
The “Trust Amendment” was signed the same day as the Dealer Agreement. It provided for the creation of a “service reserve” account, which was to consist of that portion of the cost of the service contracts which was to be segregated to pay for repairs and claims made by customers. The Trust Amendment provided as follows concerning termination:
IV. Duration of Trust Program:
This amendment shall terminate with the termination of the AGREEMENT or upon 30 days written notice by either party prior to the effective date of such termination. In the event of termination of this agreement, all obligations incurred under this amendment, shall continue until the expiration of all CONTRACTS issued prior to the effective date of termination, but no new CONTRACTS shall be included after the date thereof....
Under these contracts, Bob Dance or its affiliates essentially retained 60% of the cost of each service contract and sent 40% to WDS. WDS was entitled to keep $65 and 17%% of the 40% which it was sent as an administrative fee, which amounted to approximately 7% of the overall contract price. The remaining monies were apparently deposited into the “service reserve” account, which was then used to pay claims made by customers. The risk that claims would exceed the reserves rested on WDS.
This case concerns which entity — Bob Dance or WDS — was entitled to the unspent monies contained in the “service reserve account” after the termination of the underlying service contracts. The Trust Amendment contained three provisions relative to the disbursement of the service reserves. Paragraph II of the agreement provided:
If MINIMUM PRODUCTION LEVEL is not obtained, the related SERVICE RESERVES with applicable interest shall be removed from the account.
Paragraph III of the amendment precluded payment of disbursements to Bob Dance in any given year if, among other things, the trust program had been terminated or the dealer had failed to meet the contract’s “minimum production level” of 360 extended service contracts per dealership per year. This provision stated:
III. Disbursements.
No later than March 31 of each year the insurance carrier or WDS shall determine the experience adjustment which the DEALER may be entitled to withdraw. Such amounts shall be determined on an inception to date basis and shall be determined as SERVICE RESERVE on expired CONTRACTS, after reduction for refunds of SERVICE RESERVES for such contracts, less claims incurred with respect to such contracts, plus interest credited to the SERVICE RESERVE BANK ACCOUNT, less any deficiency determined by WDS on any unexpired CONTRACTS, and less any previous payments.
No Disbursements shall be paid in any year if (i) during the prior calendar year the DEALER did not meet the MINIMUM PRODUCTION LEVEL, or (ii) the TRUST PROGRAM has been terminated, or (iii) the DEALER’S business in the TRUST PROGRAM has an overall, inception to date loss ratio of 90% or more. Loss ratio is incurred *1175 claims divided by earned reserves and shall be determined by the insurance carrier or WDS.
(emphasis added). Finally, paragraph IV of the trust provided that if the Trust Amendment was terminated by the dealer, the dealer had no right to disbursements of any kind from the reserve account. However, the agreement stated that if the agreement was terminated by WDS, the dealer would be entitled to the monies left in the reserve account once all the underlying service contracts had expired. It stated in relevant part that:

If this amendment is terminated by the DEALER, no further DISBURSEMENTS shall be permitted and the SERVICE RESERVE BANK ACCOUNT shall be dosed.

If this amendment is terminated by WDS or the insurance carrier, no further interest shall be credit [sic] to DISBURSEMENT. However, as long as the balance exceeds $2,500, the SERVICE RESERVE BANK ACCOUNT shall be maintained to a final DISBURSEMENT after all CONTRACTS have expired.

All other terms and conditions of the AGREEMENT shall be and remain fixed as stated herein.
Bob Dance sold extended service contracts for WDS for approximately two years, but never reached the “minimum production levels” specified in the Trust Amendment. It nonetheless received “disbursements” of the unspent monies on expired contracts from the “service reserve account” during the early portion of 1994 totaling $10,494,54. However, Bob Dance apparently quit offering WDS’s extended service contracts on August 27, 1994. As of this date, the service reserve account contained approximately $100,000. These amounts were not withdrawn from the account, but were used to make payments on existing accounts through 1996.
Bob Dance never provided WDS with written notice of termination, and it continued to do other business with WDS until the summer of 1996 when, according to WDS, Bob Dance orally informed WDS that it intended to discontinue doing all business with WDS. Shortly thereafter, on October 25, 1996, WDS withdrew a total of $95,909.24 from the service reserve account, which represented most of the monies contained in the account. Eight months later, on June 23, 1997, WDS sent Bob Dance written notice that its contracts were being terminated.
Bob Dance filed this action against WDS on July 30, 1997 to compel repayment of the monies withdrawn from the service reserve account and to establish its right to the monies contained in the account upon expiration of all the underlying contracts. The second amended complaint, on which the case was tried, contained three counts. Count one was for breach of contract. It alleged that Bob Dance was entitled to the monies in the service reserve because WDS had canceled the original contract and the trust amendment by the letter it had written to Bob Dance on June 23, 1997. The count further alleged that WDS had, in violation of part IV of the amendment, withdrawn $96,313.95 from the service reserve account from September 30, 1996 through October 31, 1996, although Bob Dance was entitled to disbursement of these monies after all the service contracts expired. The complaint acknowledged that the trust amendment required a “minimum production level” of 360 contracts per year, but stated that the requirement had been waived by defendant’s representative. Bob Dance sought damages in the amount of the withdrawn reserves, plus attorneys fees and costs. Count II of the complaint sought an accounting, and Count III sought specific performance, based on essentially the same facts.
WDS denied the material allegations of the complaint. Among its affirmative defenses were that Bob Dance was not entitled to the service reserves because: (1) Bob Dance, and not WDS, had canceled *1176 the contract; (2) Bob Dance had failed to meet the minimum production level set by the contract; (3) Bob Dance had waived its right to the service reserve fund by failing to meet the contract’s quota requirements and by canceling the contract; and (4) Bob Dance had abandoned the contract and its right to the reserve was barred by the doctrines of forfeiture and estoppel.
A non-jury trial was conducted and two witnesses testified for Bob Dance. Principally, the testimony of these witnesses served to establish a waiver by WDS of the contractual requirement to sell a minimum of 360 contracts per year. Also, Dance identified a letter which WDS had sent to Bob Dance on June 23, 1997. The letter informed Bob Dance that the agreement between WDS and Bob Dance Jeep was being terminated effective June 16, 1997. It stated in relevant part that:
I must regretfully inform you that effective June 16, 1997, the agreement between Western Diversified Services, Inc. and Bob-Dance Jeep-Eagle-Hyundai with reference to marketing and sale of all the Advantage and Advantage Plus Extended Service Contract Programs is being terminated. The contractual liability insurance policy is also canceled effective as set forth therein.
On June 27, 1997, Bob Dance’s attorney wrote to WDS, asking why WDS had withdrawn the $96,000. In response, WDS wrote them a letter saying that they had closed Bob Dance’s separate account because Bob Dance had failed to meet WDS’ quota requirements.
The threshold issue is who terminated the Dealer Agreement and the Trust Amendment. The issue is important because paragraph IV of the Trust Amendment provided that if the Trust Amendment was terminated by the dealer, the dealer had no right to disbursements of any kind from the reserve account; however, if the agreement was terminated by' WDS, the dealer would be entitled to the monies left in the reserve account once all the underlying service contracts had expired.
WDS contends that the contract was automatically terminated by Bob Dance sixty days after Bob Dance sold its last extended service contract for WDS on August 27, 1994. However, recognizing a waiver argument on the part of Bob Dance due to the failure to close the account, WDS maintains that certainly the Trust Amendment was terminated no later than August 1996, when Bob Dance informed WDS that it had discontinued all of its products. We agree. The contracts were automatically terminated by Bob Dance in 1996 after Bob Dance informed WDS that it no longer would carry WDS’s products. Bob Dance contends the letter of June 23, 1997 is substantial competent evidence that WDS canceled the contract, not Bob Dance. Even if the lower court were to disbelieve the testimony of WDS’ attorney who wrote the June 1997 letter that its purpose was simply to cancel the authorization filed with the state, as a matter of law, the contract had already terminated. Bob Dance cannot avoid the termination by relying on the “written notice” provision. It did not apply to an “automatic” termination. Besides, the provision for written notice was a provision for the benefit of the non-terminating party; the writing requirement was waivable by WDS.
REVERSED and REMANDED.
PETERSON and THOMPSON, JJ., concur.

. Actually, there were two different Bob Dance dealerships — Bob Dance Dodge, Inc. and Bob Dance Jeep Eagle, Inc. — which entered into identical contracts with WDS. Both Bob Dance dealerships were named as plaintiffs in the complaint. However, because the issues concerning both plaintiffs are the same, and their contracts are identical, they will be collectively referred to herein as Bob Dance.